

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

April 29, 1952

Hon. C. H. Cavness
State Auditor
Austin, Texas

Opinion No. V-1443

Re: Applicability of H.B.
753, Acts 52nd Legis-
lature, 1951, estab-
lishing an accounting
system for State prop-
erty, to such property
as The Alamo, the French
Embassy, Battleship Tex-
as, and the like.

Dear Sir:

Your request for an opinion is as follows:

"Your interpretation or answers to the following questions in connection with House Bill 753 of the 52nd Legislature, an Act providing for the responsibility and accounting for State property, are desired not only by this office but also by the State Comptroller of Public Accounts and the State Board of Control.

"1. Are the following agencies subject to all the provisions of House Bill No. 753?

 A. Texas Hall of State, Dallas, Texas
 B. San Jacinto Museum, San Jacinto Monument, Texas
 C. Battleship Texas, San Jacinto Monument, Texas
 D. The French Embassy, Austin, Texas
 E. The Alamo, San Antonio, Texas
 F. Museum, in the old Land Office Building here in the Capitol Grounds, operated by the Daughters of the Republic and the Daughters of the Confederacy

"2. In the event any of the above agencies are found to be subject to compliance with H.B.

No. 753, shall the records, reports, and forms
as referred to in Section 2, Sub-section (a)
thereof be filed with the Comptroller by the
agency in question, or by the State Board of
Control which serves in a supervisory capacity?"

House Bill 753, Acts 52nd Leg., R.S. 1951,
ch. 356, p. 602 (Article 6252-6, V.C.S.), provides:

"Section 1.  The Legislature finds that
the State has a very substantial investment
in real and personal property and that a sub-
stantial portion of the annual income of the
State is spent to acquire property for State
purposes and to maintain State property.  The
purpose of this Act is to establish a system
for the orderly accounting for State property,
to establish responsibility for the mainte-
nance and care of State property and to pre-
scribe the method of fixing pecuniary liabil-
ity for the misuse of State property by offi-
cials and employees.  The principles embodied
in this Act are now found in the common law
and Statutes of this State; this Act restates
those principles and prescribes the imple-
menting procedures.  The State has a real
interest in its property and is entitled to
having it managed and used in a sound and
businesslike manner so that the maximum bene-
fits may be obtained from it and the State's
investment therein protected.

"Sec. 2.  The provisions of Articles
10, 11, 12, 14, 22, and 23, Revised Civil
Statutes of Texas, 1925, and Acts, Fiftieth
Legislature, 1947, Chapter 359, on the in-
terpretation of Statutes shall apply speci-
fically to this Act.  In addition to these
standard definitions, in this Act, unless
the context otherwise requires:

"(a)  'Agency' shall include any State
department, agency, board or other instru-
mentality, whether it is financed in whole
or in part by funds appropriated by the
Legislature or not; but shall not include
local political subdivisions of the State,
such as counties, cities, towns, school
districts, flood control districts, irri-
gations districts, and the like.

"(b)  'Agency head' shall mean the full-
time State elected or appointed official or
officials who administer the agency or the
executive who has been appointed to administer
the agency by a part-time State elected or
appointed official or officials.

"Sec. 3.  All real and personal property
belonging to the State shall be accounted for
by the head of the agency which has possession
of the property.

"(a)  The Comptroller of Public Accounts
shall administer the property accounting system
established by this Act.  The State Auditor
shall administer the property responsibility
system established by this Act.  The Comptrol-
ler shall issue such rules and regulations
and manual of instruction and prescribe such
records, reports, and forms as he deems neces-
sary to accomplish the objects of this Act
subject to the approval of the State Auditor.
.  .  .

"(b)  The Comptroller shall maintain
a complete and accurate set of centralized
records of State property.  However, where
the Comptroller finds that an agency has
demonstrated its ability and competence to
maintain complete and accurate detailed re-
cords of the property it possesses without
the detailed supervision by the Comptroller,
the Comptroller may direct that the detailed
records be kept at the principal office of
such agency.  Where the Comptroller issues
such order, the Comptroller shall keep only
summary records of the property of such
agency and the agency shall keep such de-
tailed records as the Comptroller directs
and furnish the Comptroller with such re-
ports at such times as the Comptroller di-
rects.

"(c)  Each agency head shall cause
each item of State property possessed by
his agency to be marked so as to identify
it.  The agency head shall follow the in-
structions issued by the Comptroller in
marking State property.

Hon. C. H. Cavness, page 4 (V-1443)

"Sec. 4. (a) All State agencies shall comply with the provisions of this Act and shall keep the property records required by this Act.

"(b) All real property owned by the State shall be accounted for by the agency which possesses the property. . . . .

"(c) All personal property owned by the State shall be accounted for by the agency which possesses the property. The Comptroller shall by regulation define what is meant by personal property for the purposes of this Act. . . .

"Sec. 5. Each agency head is responsible for the proper custody, care, maintenance, and safekeeping of the State property possessed by his agency. . . .

"(e) Each agency shall make a complete physical inventory of all property in its possession once a year. The inventory shall be taken on the date prescribed for the agency by the Comptroller.

"(f) The agency head shall forward a signed statement describing the method by which the inventory was verified, along with a copy of such inventory within forty-five (45) days after the inventory date for the agency.

"(g) The Comptroller shall supervise the property accounting records of each agency so that the records accurately reflect the property currently possessed by the agency. The Comptroller shall prescribe the methods whereby items of property are deleted from the property records of the agency. . . ."

It is noted from the above quoted provisions that House Bill 753 is applicable to all property, real and personal, owned by the State; and to the "agency" which has possession of such property. "Agency" is defined by the act as "any State department, agency, board or other instrumentality whether it is financed

in whole or in part by funds appropriated by the Legislature or not" with exceptions not applicable to your request. Therefore, two questions must be determined in regard to each property listed in your request. First, is the property owned by the State? Second, if the property is owned by the State, what agency, as defined by H.B. 753, has possession of the property? We will discuss these questions as they regard the individual property under consideration.

1.  The Alamo Property.  S.H.B. 1, Acts 29th Leg., R.S. 1905, ch. 7, p. 7, provides in part:

> "That the Governor of the State of Texas be and is hereby authorized to purchase at a price not to exceed Sixty-five Thousand Dollars ($65,000), and to procure to be executed to the State of Texas by the owners of the property hereinafter mentioned a good and sufficient conveyance in fee of all the land in the City of San Antonio, Texas, known as the Hugo & Smeltzer Company property, formerly a part of the old Alamo Mission and adjoining the Alamo Church property now owned by the State; . . .

> "Sec. 3.  Upon the receipt of the title to said land, the Governor shall deliver the property thus acquired, together with the Alamo Church property already owned by the State, to the custody and care of the Daughters of the Republic of Texas, to be maintained by them in good order and repair, without charge to the State, as a sacred memorial to the heroes who immolated themselves upon that hallowed ground; and by the Daughters of the Republic of Texas to be maintained or remodeled upon plans adopted by the Daughters of the Republic of Texas, and approved by the Governor of Texas; provided that no changes or alterations shall be made in the Alamo Church proper, as it now stands, except such as are absolutely necessary for its preservation.  All of said property being subject to future legislation by the Legislature of the State of Texas."

Pursuant to the above quoted provisions the Alamo property as it now exists was acquired by the State and custody of the property placed in the Daughters of the Republic. In construing its provisions it was held in Conley v. Daughters of the Republic, 106 Tex. 80, 156 S.W. 197 (1913), that "the state, acting by its Legislature, had the authority to acquire title to the Alamo property and to place that property in the custody of the corporation, the Daughters of the Republic." The court also stated:

> "We are of the opinion that by the acceptance of the terms of the statute the corporation became a trustee for the State."
> 156 S.W. at 200.

Since the Daughters of the Republic is a trustee for the State, it is an "instrumentality" which has possession of state property, and it is our opinion that it constitutes an agency for the State within the meaning of H.B. 753. Therefore, the Daughters of the Republic, being the agency in possession of the Alamo property, should keep the property records required by the act, account for all property owned by the State in its possession, and file such reports as directed by the Comptroller. Letter Opinion to Honorable Hall H. Logan, Chairman of State Board of Control, dated December 13, 1949.

2. The French Embassy Property. H.B. 728, Acts 49th Leg., R.S. 1945, ch. 286, p. 455 (Art. 687b, V.C.S.) provides:

> "Section 1. There is hereby appropriated all moneys now in the Texas Centennial Commission funds if and when available to apply on the purchase of the French Embassy building and all properties therein.

> "Sec. 2. Said property to consist of Embassy building and two and one-half (2½) acres out of the Southeast part of Outlot No. 1, in Division B, City of Austin, Texas, facing easterly on San Marcos Street, with line commencing at the intersection of San Marcos and Ninth Streets and running southerly with the West line of San Marcos Street to an alley between Seventh and Ninth Streets.

"Sec. 3. <u>Said building is hereby set aside for the uses and purposes of the Daughters of the Republic of Texas, and the said Daughters of the Republic of Texas be and the same are hereby authorized to take full charge of said building and use of the same as they may see proper. The property of the said French Embassy shall be the property of the State,</u> and the title of said property shall remain in custody of the Board of Control."

Pursuant to the foregoing provisions the State Board of Control was authorized to purchase the French Embassy property for the State. Att'y Gen. Op. V-206 (1947). As soon as title was acquired by the State, custody and possession of the French Embassy property was placed in the Daughters of the Republic in accordance with the provision of H.B. 728 of the 49th Legislature. Therefore, our discussion relative to the Alamo property is applicable to the French Embassy property.

3. Battleship Texas. The Battleship Texas was acquired by the State by gift from the United States Government.

Article 6145-2, V.C.S., created the Battleship Texas Commission for the purpose of accepting the gift and maintaining the property as a permanent memorial. Section 3 provides:

"The duties of the Commission shall be: To provide a proper berth for the Battleship 'Texas,' to select a location adjacent to, or on, the San Jacinto Battlegrounds for such berth; to ready the vessel for visitation by the public; to ascertain and institute a proper charge for admission to said vessel; to maintain and operate said vessel as a permanent memorial and exhibition, and to allocate the money herein appropriated as may be necessary for the fulfillment of the duties contained herein. Said Commission is further authorized to perform all other duties in addition to those specifically named above or mentioned below which are necessary to carry out the provisions and purposes of this Act. The aforesaid

> Commission shall be and hereby is authorized
> to accept gifts or donations for the pur-
> poses of this Act."

In a letter opinion to Mr. Gordon H. Lloyd,
Executive Secretary of the Employees Retirement System,
dated April 11, 1949, this office held that employees
of the Battleship Texas Commission were eligible to
become members of the State Employees Retirement System
since the Commission is a "Department" of the State
Government within the meaning of Article 6228a, V.C.S.

In view of the foregoing, it is our opin-
ion that the Battleship Texas Commission is an "agen-
cy" of the State within the meaning of H.B. 753. As
it has possession of the Battleship Texas, it should
keep the property records required by the act.

4. San Jacinto Museum Property. "The San
Jacinto State Park", composed of the lands owned and
acquired by the State called the San Jacinto battle-
field, was established in 1907 by the Legislature and
placed in the custody of the State Superintendent of
Public Buildings and Grounds (now State Board of Con-
trol) and the San Jacinto State Park Commissioners.
S.B. 18, Acts 30th Leg., R.S. 1907, ch. 48, p. 104.

In 1939, the San Jacinto Memorial Tower was
constructed and the Legislature then authorized the
State Board of Control to contract with the San Jacinto
Museum of History Association to the end that the as-
sociation should assume the care, custody and control
of the San Jacinto Memorial Tower. S.C.R. 21 of the
46th Leg., R.S. 1939, p. 733.

Attorney General's Opinion O-951 (1939) up-
held the validity of a contract placing the care,
custody, and control of the San Jacinto Memorial Tower
in the San Jacinto Museum of History Association,
stating:

> ". . . The contract does not violate
> Article 3, Section 51 of our Constitution,
> nor, so far as we have observed, any other
> portion or provision of the Constitution
> of Texas. The authority of the State of
> Texas to enter into contracts of this char-
> acter was upheld in the case of Conley vs.
> Daughters of the Republic, 156 S.W. 197.
> . . .

". . . By Section 6 of the con-
tract, it is contemplated that the corpora-
tion, as trustee for the State, shall use
the money collected from operating the
elevator to defray the expenses of operat-
ing the elevator, paying janitors and watch-
men, and for maintenance and policing of
the building, and for complying with the
general terms of the resolution of the Legis-
lature in respect to insurance, with the
balance of said moneys, as well as the bal-
ance of the net profits remaining after the
payment of such expenses, to be used on the
grounds of the San Jacinto State Park under
the direction of the Board of Control. . . ."

Since the San Jacinto Museum of History As-
sociation is trustee for the State, it is our opinion
that it constitutes an "agency" of the State within
the meaning of H.B. 753. Since it is in possession
of the San Jacinto Memorial Tower, the San Jacinto
Museum of History Association should keep the property
records required by H.B. 753, account for all State
property in its possession as required by the act,
and file such reports as directed by the Comptroller.

5. Old Land Office Building Property. H.B.
831, Acts 34th Leg., R.S. 1915, ch. 208, p. 486, pro-
vides in part:

"That as soon as the building located
near the Capitol and known as the General
Land Office Building, in Austin, Travis coun-
ty, Texas, is vacated the same is hereby set
aside for the uses and purposes of the Daugh-
ters of the Republic and the Texas Division
of the Daughters of the Confederacy; and the
said Daughters of the Republic and the Texas
Division of the Daughters of the Confederacy
be and the same are hereby authorized to
take full charge of said building and use
the same conjointly as they see proper; pro-
vided, however, that the Daughters of the
Republic shall occupy the upper floor of said
building and the Texas Division of the Daugh-
ters of the Confederacy shall occupy the lower
floor of said building.

"In order that the said building known

as the General Land Office, and now occupied
as the General Land Office, in Austin, Travis
county, Texas be properly repaired and re-
modeled, after the same has been vacated
as the General Land Office, the sum of ten
thousand ($10,000.00) dollars or so much
thereof as may be necessary, is hereby ap-
propriated out of any fund not otherwise
appropriated, to be used in repairing and
remodeling said building, the same to be
expended under the direction of the Super-
intendent of Public Buildings and Grounds."

The Legislature by the above quoted provi-
sions placed the custody and control of the "Old Land
Office Building" in the Daughters of the Republic and
the Daughters of the Confederacy, thereby making them
trustees for the State.  Conley v. Daughters of the
Republic, supra.  Therefore, our discussion relative
to the Alamo property and the French Embassy property
is applicable to the "Old Land Office Building."

6.  Texas Hall of State property.  S.B. 22,
Acts 43rd Leg., 2nd C.S., 1934, ch. 69,  p. 164, created
the Texas Centennial Commission, granting it "plenary
power to do any and all things in its judgment neces-
sary to carry out the purposes of the organization,"
to-wit, the holding of the Texas Centennial Celebration
or Celebrations in 1936.  Section 14 of the act, how-
ever, provided:

"All lands and buildings purchased by
Legislative appropriations and all net prof-
its that may be acquired by said Commission
shall be turned over to the State of Texas
within two years from the close of the Texas
Centennial celebration for such disposition
as the Legislature may then determine after
a final report to the Legislature by the
Commission shall have been filed with the
Secretary of State, and the Commission shall
then be discharged by legislative action,
and the corporation dissolved."

Section 11 of H.B. 11, Acts 44th Leg., R.S.
1935, ch. 174, p. 427, provides:

"All permanent buildings to be erected
in the City of Dallas for the Central

Exposition erected out of funds hereby
appropriated shall be upon the site of
the Centennial Central Exposition in the
City of Dallas in accordance with plans
and specifications approved by the Texas
Centennial Central Exposition, and on land
the title to which shall be in the State
of Texas. The Texas Centennial Central
Exposition shall have the right to, pos-
session of, and the free use and occupancy
of the said buildings for the duration of
the Central Exposition; provided, however,
that the aforesaid buildings and the land on
which they will be situated are hereby leased
by the State of Texas to the City of Dallas
for a period of twenty (20) years, commenc-
ing at the termination of the Central Exposi-
tion, at a rental of One Hundred Dollars
($100) per year for said buildings, payable
annually in advance. . . ."

On October 15, 1935, the City of Dallas is-
sued a warranty deed on a tract of land situated in
Dallas to the State of Texas upon which the Texas Hall
of State was built. Vol. 1920, page 397 of the Deed
Records of Dallas County, Texas.

On February 25, 1938, pursuant to the pro-
visions of H.B. 11 of the 44th Legislature, the State
of Texas acting through the Board of Control leased
the Texas Hall of State to the City of Dallas for a
period of twenty years. This lease contract provided
in part:

"The City of Dallas covenants and agrees
that during the term of this lease, said build-
ing, furnishings, and equipment shall be used
only for public purposes, including annual
State expositions, and that such building
shall not be maintained or operated for pur-
poses of private profit; that there shall be
no charge imposed upon any exhibitor in any
of said buildings for exhibit space, and
that there shall be no admission charge
for entrance into such building."

The City of Dallas is merely a lessee of
the State by virtue of H.B. 11 of the 44th Legisla-
ture and not an agent or trustee for the State. There-
fore, it is our opinion that the State Board of Control

is the agent of the State in possession of the Texas Hall of State property and is required to keep the property records, account for all property owned by the State in its possession, and file such reports as directed by the Comptroller.

## SUMMARY

House Bill 753, Acts 52nd Leg., R.S. 1951, ch. 356, p. 602 (Article 6252-6, V.C.S.), establishing an accounting system for state property is applicable to the Texas Hall of State, San Jacinto Memorial Tower, Battleship Texas, French Embassy, Alamo, and the Old Land Office Building, all of which property is owned by the State of Texas. The groups or associations in possession of these state properties are "agencies" of the State as that term is defined in H.B. 753, and are, therefore, required to keep the property records, account for all State property in their possession, and file such reports as directed by the Comptroller of Public Accounts, as provided in H.B. 753.

Yours very truly,

PRICE DANIEL
Attorney General

APPROVED:

J. C. Davis, Jr.
County Affairs Division

E. Jacobson
Reviewing Assistant

By John Reeves
John Reeves
Assistant

Charles D. Mathews
First Assistant

JR:mh